TRANSAMERICA INSURANCE CORPORATION, INC., for and on Behalf of STROUP SHEET METAL WORKS, Plaintiff–Appellant,

v.

The UNITED STATES, Defendant–Appellee.

No. 92–5044.

United States Court of Appeals, Federal Circuit.

Sept. 4, 1992.

Victoria H. Tobin, Hendrick, Spanos & Phillips, Atlanta, Ga., argued, for plaintiff-appellant. With her on the brief, was David R. Hendrick.

Arnold M. Auerhan, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued, for defendant-appellee. With him on the brief, were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Martha DeGraff, Asst. Director. Of counsel was Jeanne E. Davidson, Dept. of Justice.

Before LOURIE, Circuit Judge, BENNETT, Senior Circuit Judge, and RADER, Circuit Judge.

BENNETT, Senior Circuit Judge.

## DECISION

Transamerica Insurance Corporation appeals from a bench ruling of the United States Claims Court which granted the United States' motion to dismiss Transamerica's complaint for lack of subject matter jurisdiction. The Claims Court found that the contractor's submissions did not

constitute a claim under the Contract Disputes Act of 1978 (CDA), 41 U.S.C. § 601, because they did not request a final decision from the contracting officer. In the alternative, the Claims Court held that the contractor's claim certification was fatally flawed because it was unduly qualified. This court reverses and remands.

## BACKGROUND

On September 15, 1987, the United States Army Corps of Engineers (Government) entered a contract with contractor Bodenhamer Building Corporation (BBC) for the construction of Bowley Elementary School at Fort Bragg, North Carolina, for the contract price of $3,804,000. On October 6, 1987, Bodenhamer entered into a subcontract with Stroup Sheet Metal Works for specified roofing work under the contract. Transamerica Insurance Corp., acting as surety, issued payment and performance bonding for the Bowley project.

Construction under the roofing subcontract began in late summer 1988 at which time Stroup discovered a disparity between the actual requirements of the subcontract and the roof plan on which it had based its bid and so informed BBC. In an August 2, 1988 letter, BBC notified the Area Engineer at Fort Bragg of the specification discrepancy, informing him that the roof plan was incorrectly scaled and that in actuality there was "approximately two times the square footage shown on the roof plan." BBC further notified the Government that this discrepancy would require additional material, labor and time, with delays affecting the completion date, and that as of 3 p.m. on August 2, Stroup's roofing operation had been stopped until direction could be received on how to proceed.

Responding to BBC in a letter dated August 3, 1988, the contracting officer's authorized representative stated that: (1) as the contractor, BBC was responsible for and should have reviewed the drawings and that "approval by the contracting officer shall not relieve the contractor from responsibility for any errors or omissions in such drawings;" (2) the contractor should

have notified the contracting officer of these discrepancies earlier; (3) drawings which purport to be done to scale are not necessarily binding; (4) "the Contractor shall compare all drawings and verify the figures before laying out the work and will be responsible for any errors which might have been avoided thereby;" and (5) BBC was requested to submit a written corrective plan of action by August 10, 1988.

On August 9, 1988, BBC drafted two letters, one to its subcontractor Stroup and one to the contracting officer. The Stroup letter notified the subcontractor of the Government's denial of responsibility, instructed Stroup to continue to work on the project pending resolution of the claim, and offered to be the "conduit" for an equitable adjustment claim which Stroup could make to the contracting officer. The letter to the contracting officer stated BBC's position that the problem in the specifications arose due to errors in the contract drawings and thus that "this problem is a design error which is the responsibility of the Government and not the Contractor." BBC further stated, "[w]e can offer no written corrective plan of action inasmuch as we have done nothing wrong which needs to be corrected.... We recognize your letter as a directive ... which constitutes a constructive change to the Contract. Accordingly, we hereby notify you that we are proceeding as directed by you and reserving all rights granted us under the Contract for an equitable adjustment in the Contract for all additional costs incurred, both direct and indirect, as a result of this design deficiency."

In an August 26, 1988 letter, Stroup submitted to BBC a request for equitable adjustment of the subcontract, maintaining that the alleged defect in the roofing specifications increased the cost of performance by $241,919. As part of the equitable adjustment request, Stroup included a request for an extension of time for the duration of construction due to the expanded scope of work of 135 days and included a certification signed by Stroup's president. In a September 1, 1988 letter, BBC submitted Stroup's claim and request for eq-

uitable adjustment to the contracting officer and included a certification executed by BBC's president.

On or about September 6, 1988, BBC notified the Government of its intention to abandon its contractual obligations and on September 8, 1988, the Government terminated the BBC contract for default. On September 15, 1988, Stroup learned that BBC's contract was in default and that the surety Transamerica would be taking over the project through completion contractor Sebco. Thereafter, Transamerica entered a ratification agreement with Stroup for the completion of Stroup's contractual obligations on the project. On November 7, 1988, Transamerica and the Government entered into a surety takeover agreement under which Transamerica agreed to take over and complete performance of the BBC contract. The agreement provided that the "surety shall have the right to pursue and settle all existing and future claims that arise under this contract."

On November 25, 1988, Stroup wrote the Chief of the Claims Section of the U.S. Army Corps of Engineers, urging him to make an expeditious decision on the pending equitable adjustment claim which had been submitted on September 1. On February 21, 1989, Stroup talked by telephone with both the Government and the former general contractor in an effort to get a final decision on its claim. After the conversation, on March 8, 1989, Stroup submitted to Transamerica and to the Government a revised cost summary on Form 1411 with a revised claim for equitable adjustment. On March 15, 1989, the contracting officer requested submission of supplemental information, including all cost and pricing data as well as a recertification of the claim by the surety. The contracting officer also required that Transamerica adopt Stroup's claim as its own "since Stroup does not enjoy privity of contract with the Government" and that if the request for more time was "intended to assert a right to a contract time extension, Stroup and/or

Transamerica should submit full justification for the requested time extension."

On March 28, 1989, the contracting officer issued a preliminary decision denying the request for equitable adjustment. The decision stated:

The claim is presented as a request for equitable adjustment and the basis of it is not clearly stated.... I acknowledge that the graphic scale provided was erroneous and reliance upon dimensions scaled from that undimensioned schematic plan would have resulted in quantities of the various elements of the roofing system which were substantially less than the quantities actually required to be performed.... Under the circumstances of these bid documents, any reliance upon the Roof Plan for quantities of required work was imprudent and such reliance is at the risk of the bidder. Based on the above, it is my present intent to deny your claim; however, this is not my final decision. I will consider any additional information you may have or meet with you to discuss the claim.

On May 17, 1989, Stroup's counsel took exception to the contracting officer's request for a second certification by Transamerica as requested in the March 15 letter. But on May 18, 1989, Transamerica submitted to the Government its certification of Stroup's claim signed by the Eastern Bond Claims Manager for Transamerica.

On July 5, 1989, Stroup completed all work required under the subcontract on the Bowley project. On August 8, 1989, Transamerica submitted to the Government a contract pricing proposal cover sheet, revising the equitable adjustment claim upward to $265,549.89 plus interest. On April 13, 1990, the contracting officer issued a unilateral contract modification adjusting the contract price upward by $179,530.25 plus interest, based upon the contracting officer's determination that the erroneous roof scale constituted a changed condition entitling the contractor to an equitable adjustment of its contract amount.[1] On April 23–

1. The Modification stated, "[i]t is understood and agreed that on account of the foregoing

modification of said contract, additional time will not be allowed. It is further understood

24, 1990, Stroup's counsel protested the "accord and satisfaction" language of the change order, but after the Government agreed that acceptance of the modification amount did not waive its right to pursue the remainder of equitable adjustment costs on appeal, Transamerica and Stroup agreed to accept the modification as partial payment only.

On October 24, 1990, Transamerica filed a complaint in the Claims Court, seeking a judgment against the Government in the amount of $86,019.64 plus interest (the difference between the amount awarded in the unilateral contract modification and the amount sought as equitable adjustment), reasonable costs and attorney fees and any other relief considered appropriate. On July 12, 1991, the court conducted a status conference which included arguments on jurisdictional issues, and on October 31, 1991, the court conducted a hearing on the Government's motion to dismiss, at the end of which the Claims Court pronounced its findings and conclusions from the bench, granting the United States' motion to dismiss for lack of subject matter jurisdiction and finding that Transamerica's letters (mainly the September 1, 1988 letter but also considering the August 26, 1988 letter) did not constitute a claim under the CDA because they did not request a final decision from the contracting officer. In the alternative, the Claims Court held that certification of the claim was invalid because language in the cover letter submitted with the certification impermissibly qualified it. On November 1, 1991, the complaint was dismissed on the jurisdictional grounds set out in the bench ruling. Transamerica appealed.

## DISCUSSION

### Standard of Review

■ "This court reviews Claims Court judgments to determine whether they are 'incorrect as a matter of law' or premised on 'clearly erroneous' factual determinations." *Whitney Benefits, Inc. v. United States*, 926 F.2d 1169, 1171 (Fed.Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991), *quoting Heisig v. United States*, 719 F.2d 1153, 1158 (Fed.Cir. 1983). The court reviews a dismissal for lack of jurisdiction *de novo*, jurisdiction being a question of law.

### Request for a Contracting Officer's Final Decision

■ The main question before this court on appeal is whether the Claims Court erred in holding that BBC's September 1 submissions did not include a request for a final decision, either express or implied, as the Government alleges it was required to do under the CDA and case law. Transamerica argues that the claim as submitted by BBC to the contracting officer met all the requirements of the CDA and thus conferred jurisdiction on the Claims Court. Section 605(a) of Title 41 U.S.C. states:

> All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision.

Section 605(a) by requiring submittal of a written claim "for decision" does not of itself add any authority to the argument that there must be an explicit request for a contracting officer's final decision. The statute's broad language demonstrates that as long as what the contractor desires by its submissions is a final decision, that prong of the CDA claim test is met.

Besides the little actual guidance the statute provides on this issue, the Government in this case relies on this court's decision in *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387 (Fed.Cir. 1987), for the statement that Mingus' letters sent to the contracting officer purporting to be claims under the contract did not qualify as claims because, in addition to noncompliance with other claims factors, "[t]hey do not request a decision from the contracting officer nor could they." *Id.* at 1395. In *Mingus*, this court affirmed the Claims Court's grant of summary judg-

---

and agreed that the adjustment constitutes compensation for all costs and markup directly and indirectly attributable to the change ordered, for all delays related thereto, and for performance of the change within the time frame stated."

ment in favor of the Government on Mingus' equitable adjustment claim for damages arising out of a road construction contract on the Hopi Indian Reservation in Navajo County, Arizona. The court found, *inter alia*, that certain letters from the contractor to the contracting officer which expressed an intent to file a claim and stated that the contractor was in the process of assessing impact from changed conditions, did not constitute claims. As Transamerica aptly points out, *"Mingus* turned upon this Court's consideration of 'the special and limited circumstances under which a claim can be considered despite the execution of a release.' *Mingus,* at 1395. No similar issue exists in this case." As *Mingus* itself points out, "any extension of the opinion's language beyond what was needed to decide the facts of that case is properly characterized as dicta." *Mingus,* at 1394. The language the Government relies on in *Mingus* is thus dicta, that case not turning on nor deciding the issue of whether or not a request for a decision of a contracting officer was necessary nor how specific that request need be, and this case does not deal with the consideration of a claim attempted to be submitted after a release of claims has been executed.

In setting out the aforementioned language, the *Mingus* court cited the Claims Court's decision in *Hoffman Construction Co. v. United States,* 7 Cl.Ct. 518 (1985). *Mingus,* 812 F.2d at 1395. The Claims Court in *Hoffman* stated:

> The court believes that in order to establish that a 'claim' has been submitted to a contracting officer *the relief requested must include an expression of interest in a final decision by the contracting officer.* Such a belief is supported by the language in section (c)(iii) of the Disputes Clause which states that a written claim shall be submitted to the contracting officer *for decision. See also* 41 U.S.C. § 605(a).

7 Cl.Ct. at 525–26 (emphasis added). For this proposition, *Hoffman* relied on section 605(a) and on the Court of Claims' decision in *Paragon Energy Corp. v. United States,* 227 Ct.Cl. 176, 645 F.2d 966 (1981).

As explained above, section 605(a) does not speak authoritatively to the issue sought to be proved by the Claims Court in this case. Furthermore, the citation to *Paragon Energy* for authority for this "requirement" is also off the mark. While it is true that the *Paragon* court considered the question of whether the written claim was "submitted to the contracting officer for a decision" under section 605(a), in that case the Court of Claims found that because the "letter expressed Paragon's interest in a 'final decision' with regard to its 'request for contract reformation,' " that sufficed to meet the standard of section 605(a). However, the *Paragon* court, in no way set up such a requirement under section 605(a). It simply found that the particular factual showing in its case met the articulated statutory standard. Thus, the Claims Court's decision in *Hoffman* does not provide support for the proposition that the claim must explicitly request a contracting officer's decision, but that all that need be shown is an "expression of interest," which may be made implicitly.

The Claims Court relied in its ruling in this case on *Mingus* and on its own previous opinion in *Sun Eagle Corp. v. United States,* 23 Cl.Ct. 465 (1991). In *Sun Eagle,* the Claims Court stated that "plaintiff did not expressly request a final decision in the November 29 letter, nor is there any implication that plaintiff desired a final decision. The letter sets forth a statement of rights and payment amounts and requests a meeting to discuss these issues. Indeed, it would be inconsistent to find that plaintiff impliedly requested a final decision when it expressly requested a meeting to discuss the situation." Although the Claims Court may have been correct in *Sun Eagle* in its assessment that there was no implication that the plaintiff sought a contracting officer's final decision, we must disagree with its general statement on the inconsistency between a request for a final decision and the suggestion of discussions on the issue.

In fact, there are two immediate distinctions between the *Sun Eagle* case and this case: *first,* in this case, it is impossible as a matter of logic and in light of the circumstances, to state that there is no implication

that plaintiff desired a final decision; that is obviously what Stroup desired—a final decision by the contracting officer on its equitable adjustment claim; *second,* the statement as to inconsistency between a request for a final decision and the request for future meetings was clearly ruled on previously by this court in *Contract Cleaning Maintenance, Inc. v. United States,* 811 F.2d 586 (Fed.Cir.1987), of which case, the Claims Court was obviously aware in its *Sun Eagle* opinion. We address these issues *seriatim.*

### I.

The September 1 letter submitted to the contractor did not use the explicit words "we request a final decision from the contracting officer," but it is clear from the language of the letter itself that that is what BBC wanted. BBC considered this letter a CDA claim filed with the authorized representative of the contracting officer. Clearly, BBC desired a response to this letter, and since BBC intended this letter to serve as a statutory claim, it also intended that the contracting officer either grant or deny the claim in a final decision.

█ Further, the contracting officer was on notice that Stroup wanted a final decision on its claim dating back to Stroup's November 25, 1988 letter to the Chief of the Claims Section of the U.S. Army Corps of Engineers which requested a prompt decision on the pending equitable adjustment claim. Stroup's February 21, 1989 telephone conversation with the Government and the former general contractor also notified the Government that it sought a final decision on its claim. This court will not require contractors to do more than to comply as fully and reasonably as possible with the statutory requirements of the CDA when this court has definitively stated that certain "magic words" need not be used and that the intent of the "claim" governs. *See Contract Cleaning,* 811 F.2d at 592.

The September 1 letter was in writing, was submitted to the contracting officer for a decision, requested payment of a sum certain, and gave the contracting officer adequate notice of the basis and the amount of the claim. This court is loathe to believe that in this case a reasonable contractor would submit to the contracting officer a letter containing a payment request after a dispute had arisen solely for the contracting officer's information and without at the very least an implied request that the contracting officer make a decision as to entitlement. Any other finding offends logic.

### II.

As a general proposition, this court clearly stated in *Contract Cleaning,* "[w]e know of no requirement in the Disputes Act that a 'claim' must be submitted in any particular form or use any particular wording. All that is required is that the contractor submit in writing to the contracting officer adequate notice of the basis and amount of the claim." *Id.* at 592. This view is obviously consonant with the CDA itself which, besides the direction given in section 605(a) as set out herein, does not address the specific requirements which a claim must contain. In *Contract Cleaning,* one of the appealed issues was whether certain letters submitted by the contractor requesting payment for contract amounts constituted CDA claims. The letters requested the payment of monies allegedly owed under the contract and indicated the contractor's willingness to work with the contracting officer to "finalize and conclude this matter," suggesting that the parties sit down, discuss, and resolve the matter through negotiation. *Id.* at 588–89. The Government in that case disputed whether any of the letters constituted CDA claims, but this court stated that "[t]he letters the appellant wrote to the government ... constituted a claim under the Disputes Act—as GSA itself explicitly recognized with respect to at least one of those letters."[2] The *Contract Cleaning*

---

**2.** Transamerica states in this case that the contractor's intent in its submissions "was not only discernable, but clearly understood by the con-

tracting officer as evidenced by subsequent correspondence." Just as occurred in *Contract Cleaning Maintenance, Inc. v. United States,* 811

court, contradicting the Claims Court's statements in its ruling in this case, stated, "[t]he fact that in those letters the appellant frequently expressed the hope that the dispute could be settled and suggested meeting to accomplish that result does not mean that those letters did not constitute claims." 811 F.2d at 592. There is no necessary inconsistency between the existence of a valid CDA claim and an expressed desire to continue to mutually work toward a claim's resolution. S.Rep. No. 1118, 95th Cong., 2d Sess. 1 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235, states that the purpose of the Contract Disputes Act was to "induce resolution of more contract disputes by negotiation prior to litigation...." All tribunals should foster negotiation as a mechanism for the resolution of disputes instead of erecting definitional structures which preclude, for their own validity, ongoing settlement measures. In this case, the fact that BBC's submissions on behalf of Stroup stated that the contractor desired to meet and discuss the equitable adjustment request does not prevent the qualification of those requests as claims under CDA.

■ Transamerica states in its Reply Brief, "[i]t is the position of Transamerica that the [CDA] statutory requirements as interpreted by this Court suggest *a common sense analysis* to determine whether (1) the contractor asserted in writing and with sufficient specificity a right to additional compensation, (2) the government disputed that right, and (3) the contractor communicated his desire for a contracting officer decision." This court agrees. Applying such a logical, common sense analysis in this case, BBC's submissions were sufficient to qualify as CDA claims.

### Certification

■ Despite the fact that the Claims Court stated that once making a finding on the "claim" issue, it did not "deem it necessary to continue to argue the point of proper or improper certification," the court, in its ruling, reached as an alternative basis for its "claim" decision the issue of the sufficiency of BBC's certification. The court found that the certification was defective because it was unduly qualified, relying for this finding on language found in the cover letter appended to the certification.

Section 605(c)(1) of Title 41 states on the issue of claim certification:

For claims of more than $50,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.

The Court of Claims discussed the importance and purpose of the certification requirement in *Paul E. Lehman, Inc. v. United States*, 230 Ct.Cl. 11, 673 F.2d 352, 354 (1982):

An important objective of Congress was to "discourag[e] the submission of unwarranted contractor claims." S.Rep. No. 1118, 95th Cong., 2d Sess. 5, *reprinted in* [1978] U.S.C.C.A.N. 5235, 5239. One method of accomplishing this purpose was provided in section 5 of the Act, 41 U.S.C. § 604, which makes a contractor liable for the amount of any portion of its claim that it is unable to support because of misrepresentation or fraud. Another was the certification requirement.

This court in *Fidelity Construction Co. v. United States*, 700 F.2d 1379, 1384 (Fed. Cir.), *cert. denied*, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 103 (1983), stated that the certification requirement was one of the "most significant provisions of the CDA" and that Congress viewed the certification requirement "as a mechanism to discourage the submission of unwarranted claims and encourage prompt settlements."

F.2d 586 (Fed.Cir.1987), the Government in this case referred to BBC's September 1 submission as a "claim." *See* March 15, 1989 Contracting Officer letter, and March 28, 1989 Contracting Officer letter. The fact that the Government referred to the operative submission(s) as "claims" was found persuasive by this court in its *Contract Cleaning* analysis. *Id.* at 592.

In this case there appears to be some inconsistency between what the Claims Court stated at the preliminary hearing and what it said in its ruling on the certification issue. The court stated at its July 12 hearing:

[Y]ou've got an adequate certification as such, the real issue is whether the cover letter diminishes it to the extent that the general contractor could not be held liable....

The certification itself sounds like it does meet the requirements of 605c.... This certification is not qualified. It is accompanied by a cover letter that attempts to inch out of it. *However, the individual has put his John Henry to the certification and I think could be held liable.*

\* \* \* \* \* \*

The only purpose here that is served is to answer the question of *has the contractor put himself in a position where he could be prosecuted for making a fraudulent claim or statement to the contracting officer? ... this kind of self-serving other language that the contractor included in his cover letter, sounded like an attempt to diminish the certification but nonetheless, the certification was made.*

(Emphasis added.)

The clear import of the court's statements at the July 12 preliminary hearing was that in its opinion the certification was valid and that the major policy of certification of being able to hold a contractor personally liable for fraudulent claims was clearly satisfied in this case. The court clearly erred when it ultimately found that the BBC certification was impermissibly qualified by the cover letter's language.

In *United States v. Turner Construction Co.*, 827 F.2d 1554 (Fed.Cir.1987), alluded to by the Claims Court, the Government argued "that the certification must not only be submitted in good faith but must reflect the prime contractor's own belief that the submitted claim reflects the amount owed by the government and that to allow the prime to substitute the subcontractor's belief for its own in making a certification would make a sham of the certification requirement, regardless of the merits of the submitted claim, and would render meaningless the prohibition against direct appeals by subcontractors." 827 F.2d at 1561. The *Turner* court did not find this argument persuasive, stating "[w]e further agree ... that the certification requirement requires not that the prime contractor believe the subcontractor's claim to be certain, but that the prime contractor believe that there is good ground for the claim." This court agrees with that enunciation. The language of BBC's September 1, 1988 cover letter, which the Government alleges qualified BBC's certification, is perfectly consistent with that standard set out in *Turner*. BBC stated in its letter, "[t]his claim is being filed by our subcontractor and inasmuch as they do not have contract privity with you, we are acting as a conduit on their behalf in this matter. We do not have access to their books and records and, therefore, cannot make any statement with respect to the amount of their claim. However, we have no reason to believe that their cost figures and delay estimates are incorrect."

This court has previously found that even when a proposed claim certification lacks certain elements specified in the statutory standard of 41 U.S.C. § 605(c)(1), the certification can still be valid if in "substantial compliance" with the statute and its purposes. In *United States v. General Electric Corp.*, 727 F.2d 1567 (Fed.Cir. 1984), this court ruled that although the certification failed to state the amount of the claim and did not include language to the effect "that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable," it contained the critical information required by the statute and was therefore in "substantial compliance" with it.

The Claims Court erred in relying upon the "qualified certification" issue as an alternative basis for its judgment. The certification made by BBC was binding, as the court correctly recognized at the July 12 hearing. Further, the allegedly qualifying

statement in the cover letter underscored BBC's belief that Stroup had "good ground" for its claim. Overall, the certification was, at the very least, in substantial compliance with the CDA's certification requirement. Thus, the Claims Court's reliance on the impermissible qualification of the certification as an alternative basis for its decision was clear error.

## CONCLUSION

We reverse the Claims Court's judgment that it did not have jurisdiction over Stroup's equitable adjustment claim. The claim, considered in context, contained a readily ascertainable request for a contracting officer's final decision. We further hold that BBC's certification was valid and not so qualified as to make it ineffective. The certification clearly complied with the chief policy underlying the CDA certification requirement, that being the purpose of submitting the contractor to liability for fraud. We remand to the Claims Court for adjudication on the merits of the claim for equitable adjustment with interest.

## COSTS

No costs.

**REVERSED AND REMANDED.**