**ALVARADO CONSTRUCTION, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 92–599C.

United States Court of Federal Claims.

Oct. 4, 1994.

Chris M. Darby, Colorado Springs, CO, for plaintiff.

Steven J. Abelson, with whom were Asst. Atty. Gen. Frank W. Hunger, David M. Cohen, Director, and Bryant G. Snee, Asst. Director, Washington, DC, for defendant; M. Leah Wright, General Services Admin., of counsel.

## OPINION

ANDEWELT, Judge.

In this government contract action brought pursuant to the Contract Disputes Act (CDA), 41 U.S.C. §§ 601–613, plaintiff, Alvarado Construction, Inc., seeks compensation for costs and expenses incurred by its subcontractor, Burdco Environmental, Inc. (Burdco), for asbestos abatement work performed under a contract plaintiff entered with the General Services Administration (GSA). This action is presently before the court on defendant's motion to dismiss the complaint pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction. Defendant contends that this court lacks jurisdiction over the instant action because prior to instituting suit, plaintiff did not submit to the contracting officer a certified claim that satisfies the requirements of Section 605 of the CDA and related regulations and contract provisions. For the reasons set forth below, defendant's motion to dismiss is granted.

## I.

The contract in issue covered the renovation of the Federal Building/Customs House in Denver, Colorado.[1] The contract provided for certain asbestos abatement work which plaintiff subcontracted to Burdco. During performance of the contract, the parties discovered that more asbestos abatement had to be performed than originally anticipated in the contract and, as a result, the GSA issued five unilateral orders directing Burdco, through plaintiff, to perform the additional asbestos abatement work. On or about February 19, 1988, the GSA terminated for the convenience of the government certain portions of the contract, including that portion relating to asbestos abatement.

On December 21, 1988, plaintiff submitted to the contracting officer a termination for convenience settlement proposal, entitled "Interim Proposal No. 1," seeking a total termination payment of $871,942. This interim proposal did not include costs relating to Burdco's asbestos abatement work. On February 15, 1989, plaintiff submitted a "second and final proposal" seeking a total termination payment of $1,663,803. This final proposal included settlement proposals for the work of various subcontractors, including $336,914 for the asbestos abatement work performed by Burdco. The last paragraph of the cover letter accompanying the final proposal contained a certification signed by plaintiff's president, Linda G. Alvarado.

After the GSA completed an audit, the parties entered into negotiations concerning plaintiff's final proposal. Because the Inspector General had initiated an investigation into Burdco's activities with respect to the contract, the initial negotiations did not cover Burdco's costs. With the exception of Burdco's costs and a question concerning CDA interest, the parties ultimately reached an agreement as to all costs claimed in plaintiff's final proposal.

After the Inspector General completed its investigation of Burdco and declined to take any action, the parties commenced negotiations as to Burdco's costs. After the parties failed to reach an agreement, the GSA issued

a unilateral contract change order pursuant to the contract's termination for convenience clause, Federal Acquisition Regulation (FAR), 52.249-2, 48 C.F.R. § 52.249-2, which reflected the final amount the GSA believed it owed plaintiff for Burdco's costs. The cover letter accompanying the change order stated that "[t]his is the final decision of the Contracting Officer and is made in accordance with the disputes clause.... In lieu of appealing to the General Services Board of Contract Appeals, you may bring an action directly in the U.S. [Court of Federal Claims] within 12 months of the date you receive this decision." On September 1, 1992, plaintiff filed its complaint in this court seeking $200,000 for Burdco's asbestos abatement work.

## II.

■ As a jurisdictional prerequisite to a Section 609 CDA suit in this court, a contractor must first submit to the contracting officer a claim that satisfies the requirements of Section 605 of the CDA. *W.M. Schlosser Co. v. United States,* 705 F.2d 1336, 1338–39 (Fed.Cir.1983). Defendant argues that this court lacks jurisdiction over the instant action because plaintiff's February 15, 1989, final proposal does not constitute a proper CDA claim for the asbestos abatement work performed by Burdco.

While the CDA does not define the term "claim," the contract's disputes clause, FAR 52.233-1, provides, in pertinent part:

> (c) "Claim," as used in this clause, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain ... arising under or relating to this contract.... A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim under the [CDA].

In *Dawco Constr., Inc. v. United States,* 930 F.2d 872, 878 (Fed.Cir.1991), the Court of Appeals for the Federal Circuit interpreted this same language as generally requiring that a dispute exist between the parties prior to the filing of a claim. The court explained, as follows:

1. The material facts are not in dispute.

Clearly, the FAR mandates that, *inter alia*, a [CDA] claim must seek payment of a sum certain as to which a *dispute exists at the time of submission.*

Similarly, the contract's disputes clause ... states that a "request for payment that is not in dispute when submitted is not a claim for purposes of the [CDA]." The language is not ambiguous, and means what it says: A contractor and the government contracting agency must already be *in dispute* over the amount requested. Unilateral cost proposals or correspondence suggesting disagreement during negotiations, while they may ultimately lead to a dispute, do not for purposes of the [CDA], satisfy the clear requirement that the request be in dispute. *Mayfair Construction Co. v. United States,* 841 F.2d 1576, 1577 (Fed.Cir.), *cert. denied,* 488 U.S. 980, 109 S.Ct. 528, 102 L.Ed.2d 560 (1988) ("It is beyond cavil that under this clause, no claim exists unless it involves a dispute.").

(Emphasis in original.)

■ Defendant argues that under *Dawco,* plaintiff's final proposal cannot constitute a claim because it entails a unilateral cost proposal which was not in dispute at the time the proposal was submitted. Defendant is correct in so far as it contends that the final proposal was not in dispute at the time it was submitted. Plaintiff submitted its final proposal pursuant to the contract's termination for convenience clause, FAR 52.249–2, which provides, in pertinent part:

> (d) After termination, the Contractor shall submit a final termination settlement proposal to the Contracting Officer in the form and with the certification prescribed by the Contracting Officer....

> (e) Subject to paragraph (d) above, the Contractor and the Contracting Officer may agree upon the whole or any part of the amount to be paid because of the termination....

> (f) If the Contractor and the Contracting Officer fail to agree on the whole amount to be paid the Contractor because of the termination of work, the Contracting Officer shall pay the Contractor the amounts determined as follows ...:

> * * * * * *

> (i) The Contractor shall have the right of appeal, under the Disputes clause, from any determination made by the Contracting Officer under paragraph (d) [and] (f)....

Because Paragraphs (e) and (f) anticipate negotiations between the government and the contractor subsequent to the contractor's submission of the termination settlement proposal, the parties ordinarily would not be said to be in dispute as to termination costs unless and until the negotiations terminate. Herein, when plaintiff submitted its final proposal, the GSA had not yet audited the costs contained in the proposal and hence, the GSA could not have determined the extent to which it would dispute those costs. Therefore, there was no pending dispute when plaintiff submitted its final proposal.

Plaintiff does not so much distinguish *Dawco* on the facts as argue that it was wrongly decided and based upon a misinterpretation of *Mayfair Constr. Co. v. United States,* 841 F.2d 1576 (Fed.Cir.), *cert. denied,* 488 U.S. 980, 109 S.Ct. 528, 102 L.Ed.2d 560 (1988). But this court is bound by precedent of the Court of Appeals for the Federal Circuit. An argument potentially can be made, however, that may distinguish *Dawco* from the instant case. That argument has its basis in the wording of FAR 52.249–2, which was not at issue in *Dawco.* As noted above, under FAR 52.249–2, Paragraph (d) requires that a termination settlement proposal contain a certification and Paragraph (i) provides that when the contracting officer award is less than the amount the contractor proposed, the contractor "shall have the right of appeal, under the Disputes clause, from any determination made by the Contracting Officer under paragraph (d) [and] (f)." Because Paragraph (i) refers to an appeal taken "from" a determination made under paragraph (f), it can be argued that FAR 52.249–2 anticipates that the appeal will be taken directly from the contracting officer's decision not to award the amount sought in the termination settlement proposal. Such an interpretation would have the effect of saving

the contractor from going through the apparently futile acts of submitting a certified claim that seeks funds with respect to which the contractor already filed a certification and the contracting officer already determined not to award. In other words, an argument can be made that FAR 52.249-2 anticipates that termination settlement proposals will be treated as claims to the extent they are not granted by the contracting officer.

Such an interpretation can be argued to be consistent with *Dawco* in that the *Dawco* court interpreted and applied that portion of the definition of "claim" contained in FAR 52.233-1 that provides that a "voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim under the [CDA]." Termination settlement proposals submitted to the contracting officer pursuant to FAR 52.249-2 can be argued not to be routine requests for payment within the scope of FAR 52.233-1, but rather, in effect, a special type of request for payment that is covered by its own set of regulations. Pursuant to this argument, termination settlement proposals when properly certified can be argued to constitute claims when the contracting officer unilaterally determines not to grant the full amount requested. In this regard, the contracting officer herein apparently so interpreted the pertinent regulations when he stated that his award "is the final decision of the Contracting Officer and is made in accordance with the disputes clause ... [and that plaintiff] may bring an action directly in the U.S. [Court of Federal Claims] within 12 months

of the date [plaintiff] receive[s] this decision."[2]

Defendant disagrees with this interpretation of the various applicable regulations and presents a series of counter arguments.[3] It is not necessary, however, for this court to determine whether these alternative interpretations are correct because even assuming that a termination settlement proposal submitted pursuant to FAR 52.249-2 can be considered a claim after an adverse decision by the contracting officer, plaintiff's final proposal herein cannot constitute a proper claim because, as explained in Section III, *infra*, plaintiff's proposal was not properly certified.

## III.

Under controlling case law, where a claim seeks in excess of $50,000, a certification that satisfies the requirements of Section 605(c)(1) of the CDA is a prerequisite to this court's jurisdiction. *Schlosser*, 705 F.2d at 1338-39. Section 605(c)(1) provides, in pertinent part:

> For claims of more than $50,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable....

The last paragraph of the cover letter accompanying plaintiff's February 15, 1989, final proposal contained the following certification:

2. In *Mayfair*, 841 F.2d 1576, the court concluded that the contractor's termination settlement proposal therein was not a claim because it was not in dispute at the time submitted. But, as plaintiff argues, the *Mayfair* court did not base its conclusion on any requirement of the CDA but rather on a specific requirement for a dispute contained in the contract's disputes clause. The disputes clause in *Mayfair* provided:

> (b) "Claim" means:
> (1) a written request submitted to the Contracting Officer;
> (2) for payment of money, adjustment of contract terms, or other relief;
> (3) *which is in dispute....*

*Id.* at 1577 (emphasis added). The instant contract's disputes clause does not include the same

definition of "claim" and, in effect, includes a dispute requirement only for "[a] voucher, invoice, or other routine request for payment."

3. Defendant argues, *inter alia*, that because Paragraph (i) refers to appeals from determinations of the contracting officer being taken *"under* the Disputes clause" (emphasis added), that Paragraph (i) anticipates that the contractor will submit a new claim under Section 605 of the CDA prior to instituting the appeal. In addition, defendant argues that *Santa Fe Engineers, Inc. v. Garrett*, 991 F.2d 1579 (Fed.Cir.1993), stands for the proposition that a contractor cannot rely upon a certification submitted prior to the existence of a dispute and that after a dispute has arisen, the contractor must file a new certification.

As also included in [Alvarado's] enclosed material, I, Linda G. Alvarado, President of Alvarado Construction, Inc., certify that the foregoing claim is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief, and that the amount requested (after a reduction for the bond costs based on the final contract amount and subject to [Alvarado's] review of the Burdco proposal) accurately reflects the contract adjustment for which I believe the government is liable.

Earlier in that letter, plaintiff provided the following representation which explains the statement in the certification that the amount sought accurately reflects the contract adjustment sought "subject to ... review of the Burdco proposal":

Because it was only just received, [Alvarado] has not as yet examined Burdco's proposal and, therefore, excludes Burdco's proposal from the certification attested to on Sheet 4 of [Alvarado's] Form 1436. [Alvarado] does intend to review Burdco's proposal "to an extent it considers adequate in the circumstances" and will communicate its findings to the GSA when that review is completed.

Hence, for all other subcontractor costs, the certification contained an unqualified affirmative representation that plaintiff believed the government was liable for the amounts requested. For Burdco's costs, however, plaintiff qualified its representation as to government liability in that the representation was "subject to [plaintiff's] review of the Burdco proposal" because, as explained earlier in the letter, plaintiff had "not as yet examined [that] proposal."

Plaintiff contends that even if this "subject to review" qualification in the certification renders the certification not literally in compliance with the requirements of Section 605(c)(1) of the CDA, the court nevertheless should deem the certification sufficient because it is in "substantial compliance" with the statutory requirements. *See Transamerica Insurance Corp. v. United States,* 973 F.2d 1572, 1580 (Fed.Cir.1992). But plaintiff's qualification renders the certification not only inconsistent with the letter of the requirements of Section 605(c)(1), but also with its spirit.

A contractor certification was "one of the most significant provisions" that Congress added when it enacted broad changes in federal contract law in the CDA. *Fidelity Constr. Co. v. United States,* 700 F.2d 1379 (Fed.Cir.1983). During the hearings on the CDA, Admiral H.G. Rickover argued vigorously that Congress should enact a proposed certification requirement to prevent contractors from presenting overreaching and insupportable claims to contracting officers. *See, e.g., Paul E. Lehman, Inc. v. United States,* 230 Ct.Cl. 11, 14–15, 673 F.2d 352, 354 (1982). A certification requirement would discourage such unscrupulous conduct by rendering both the corporation and the signatory for the corporation potentially liable for the submission of a false claim. *Ball, Ball & Brosamer, Inc. v. United States,* 878 F.2d 1426, 1429 (Fed.Cir.1989). In *Ball,* the court summarized the importance of the certification requirement as follows:

The certification requirement furthers an important objective of Congress by "trigger[ing] a contractor's potential liability for a fraudulent claim under section 604 of the Act," *Skelly & Loy v. United States,* 231 Ct.Cl. 370, 685 F.2d 414, 418 n. 11 (1982), and thus " 'discourag[ing] the submission of unwarranted contractor claims.' " *Paul E. Lehman, Inc. v. United States,* [230 Ct.Cl. 11] 673 F.2d 352, 354 (Ct.Cl.1982) (quoting S.Rep. No. 1118, 95th Cong., 2d Sess. 5, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5235, 5239). "Congress wanted to hold the contractor personally liable, and it considered the best way to do this would be to require contractors personally to certify their claims." *Donald M. Drake Co. v. United States,* 12 Cl.Ct. 518, 519 (1987).

*Ball,* 878 F.2d at 1429.

Plaintiff's certification evades this crucial objective because it would have the effect of insulating plaintiff and its president, who signed the certification, from any significant risk of liability for an excessive claim as to Burdco's asbestos abatement costs. Even assuming defendant could show that plaintiff would have known, had plaintiff simply con-

sidered all of the information then in its possession, that its claim for Burdco's asbestos abatement costs was excessive, defendant still would be unlikely to prevail on any charge of false certification because plaintiff had qualified its certification by stating that in effect it had not yet reviewed Burdco's proposal on which its claim was based. The effect of such a qualification is the same as if plaintiff had stated that it had not yet come to any conclusion as to the government's liability for Burdco's costs but would come to such a conclusion in the future when it reviewed Burdco's proposal. Such a statement hardly is the type of representation upon which a false claim allegation could be based. Thus, plaintiff drastically limited its vulnerability to a false claim charge by failing to make the unqualified representation required by Section 605(c)(1) that "the amount requested [for Burdco's work] accurately reflects the contractual adjustment for which [plaintiff] believes the government is liable."

Plaintiff cites *Transamerica*, 973 F.2d 1572, and *United States v. Turner Constr. Co.*, 827 F.2d 1554 (Fed.Cir.1987), for the proposition that to the extent a claim covers work performed by a subcontractor rather than the contractor itself, the contractor does not have any obligation to review the claim prior to submitting a certified request for payment to the contracting officer. Because there is no obligation to review a claim for subcontractor costs, plaintiff argues, plaintiff's qualification in its certification that the amount sought in the claim was "subject to review" is not a fatal flaw.

But plaintiff's argument misinterprets *Transamerica* and *Turner* and misunderstands the obligations of a contractor when presenting claims covering subcontractor costs. In *Transamerica* and *Turner*, the Federal Circuit recognized that a contractor often will not have the same quality of information about a subcontractor's costs as it does about its own costs. The court also recognized, in effect, that Section 605(c)(1) does not require a contractor, prior to submitting a certified claim covering subcontractor costs, to secure an equivalent level of certainty as to the government's liability for the subcontractor costs as it would have for a

claim covering the contractor's own costs. But the court did not absolve a contractor of the obligation, prior to submitting a certified claim, to consider the amount of subcontractor costs sought in the claim and to assess whether, based on the information then in possession of the contractor, the claim "accurately reflects the contract adjustment for which the contractor believes the government is liable." In this regard, the *Transamerica* court noted that it agreed with the statement in *Turner* "that the certification requirement requires not that the prime contractor believe the subcontractor's claim to be *certain*, but that the prime contractor believe that there is a good ground for the claim." *Transamerica*, 973 F.2d at 1580 (emphasis added). Applying this standard, the *Transamerica* court concluded that the certification therein was effective. But the contractor in *Transamerica*, unlike plaintiff herein, included in its letter that accompanied its claim that although the contractor could not comment on the amount of the claim because it did not have access to the subcontractors' books and records, the contractor had "no reason to believe that [the subcontractors'] cost figures and delay estimates are not correct."

While a prime contractor may not have perfect information as to a subcontractor's costs, it often will have significant information as to the scope of the work performed and have some general knowledge as to the costs generally incurred for such work. In other words, the contractor may not have sufficient information to screen out all excessive subcontractor claims, but it would be able to screen out some. The deficiency in the certification herein is that plaintiff failed to include any representation equivalent to those in *Transamerica* and *Turner* to the effect that plaintiff had no reason to believe that Burdco's figures were not correct or that plaintiff believed that there was a "good ground" for Burdco's claim. To the contrary, plaintiff could not have made such a representation because it had not yet examined Burdco's proposal and without such an examination, plaintiff could not yet have determined whether its claim for reimbursement "accurately reflects [Burdco's costs] for

which [plaintiff] believes the government is liable."

In sum, the qualification in plaintiff's final proposal to the effect that the claim was presented "subject to [plaintiff's] review of the Burdco proposal" renders the certification defective because it is not in substantial compliance with the requirements of Section 605(c)(1). Any other interpretation of Section 605(c)(1) would permit contractors routinely to submit excessive claims for subcontractor work with almost no fear of sanctions. Contractors could avoid sanctions simply by failing to review the subcontractor's alleged costs prior to submitting a claim for those costs and explaining to the contracting officer, as here, that it had not yet reviewed the claim. If Section 605(c)(1) were so interpreted, much of the deterrent effect that Admiral Rickover and Congress sought to secure by including Section 605(c)(1) in the CDA would be lost and the certification requirement quickly would be recognized as a paper tiger, not to be feared by contractors when submitting claims for subcontractor costs.

### IV.

Finally, plaintiff presents a series of equitable arguments, including that the contracting officer never objected to the adequacy of the certification and that plaintiff would face significant economic harm if the court holds the certification defective. But under controlling case law (1) a proper certification under Section 605(c)(1) is a prerequisite to this court's jurisdiction in a suit brought under Section 609 of the CDA (*Schlosser*, 705 F.2d at 1338–39) and (2) this court lacks authority to expand the scope of its jurisdiction based on equitable considerations (*Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 818, 108 S.Ct. 2166, 2179, 100 L.Ed.2d 811 (1988)). Moreover, Congress recently considered the equities raised by defective claims when it adopted amendments to the CDA that eliminated the jurisdictional nature of a deficient certification. 41 U.S.C. § 605(c)(6) ("A defect in the certification of a claim shall not deprive a court ... of jurisdiction over that claim"). Unfortunately for plaintiff, however, Congress determined that this amendment would not apply retroactively to claims, such as plaintiff's, that were the subject of a suit in this court on the date of enactment, October 29, 1992. Hence, in resolving the issue of retroactivity in the way that it did, Congress mandated that this court evaluate plaintiff's claim under the pre-existing law. For the reasons described above, under that law, the defects in plaintiff's certification deprive this court of jurisdiction over plaintiff's claim.

### Conclusion

For the reasons set forth above, defendant's motion to dismiss is granted, and the Clerk of the Court shall enter judgment dismissing plaintiff's complaint. No costs.

IT IS SO ORDERED.