**BLAKE CONSTRUCTION COMPANY, INC., a Delaware Corporation; and Blake Construction Company, Inc., for the use and benefit of Steiny and Company, Inc., a California Corporation, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 471–88C.

United States Court of Federal Claims.

July 9, 1993.

---

Richard D. Corona, San Diego, CA, atty. of record, for plaintiff.

Martha H. Degraff, Commercial Litigation Branch, Civ. Div., Dept. of Justice, with whom was Director David M. Cohen and the Asst. Atty. Gen., attys. of record, for defendant.

## *OPINION*

HORN, Judge.

This case is before the court on the defendant's motion for summary judgment. The plaintiff, Blake Construction Company (Blake), a Delaware Corporation, brought this action pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 609(a) (1982) (CDA). The plaintiff alleges that the defendant, through employees at the United States Department of the Navy (Navy), directed it to perform work which constitutes a constructive change to the contract. After the plaintiff requested an equitable adjustment to the contract price on August 11, 1987, the contracting officer issued a final decision denying the plaintiff's claim on the basis that the claim had not been properly certified.

In the complaint filed with this court,[1] plaintiff alleges that the Navy caused a change to the scope of the contract when it directed the plaintiff to install rigid steel conduit instead of PVC conduit when installed underground.[2] Plaintiff further alleges that, on or about January 23, 1987, plaintiff transmitted a certified cost proposal in the amount of $327,231.00 to the Navy, followed by two additional letters from the plaintiff to the defendant, dated March 27, 1987 and June 12, 1987.[3] In

1. By enactment of the Court of Federal Claims Technical and Procedural Improvements Act of 1992, Pub.L. No. 102–572, the United States Claims Court was renamed the United States Court of Federal Claims. In accordance with General Order 33 issued by the United States Court of Federal Claims, the court adopted the rules of the United States Claims Court. The substance of the rules of the court, discussed herein, is unaffected by the legislation, other than with respect to the name change of the court and, therefore, the name change of the rules. However, General Order 33 also indicates that if there is a conflict between the new statute and the rules, the statute will control.

2. PVC is an abbreviation for polyvinyl chloride, "a white water-insoluble thermoplastic resin,

used chiefly on phonographic records and metal pipes in floor covering and in fabrics, esp. [sic] rainwear." *See* The Random House College Dictionary, revised edition (Random House, Inc. 1980). In the instant case, PVC is used as a coating on rigid metal conduit and as the material component of PVC conduit.

3. The court was disturbed to learn that plaintiff has maintained at least two other lawsuits regarding the very same contract, the same contractor, the same subcontractor and the same electrical installation at the San Diego Naval Regional Medical Center. Although different parts of the electrical installation may have been involved, the two lawsuits also concern the "claims" of the plaintiff's subcontractor, Steiny & Company (Steiny), for additional monies be-

response to the complaint, the defendant filed an answer requesting dismissal of the complaint, asserting that the plaintiff is not entitled to the relief requested. Rather than file a motion to dismiss, however, defendant filed a motion requesting summary judgment asserting that the Navy had made no changes to the contract requirements and, therefore, plaintiff is not entitled to an equitable adjustment to the contract price.

Oral argument was heard by the court after submission of briefs by both parties. Subsequent to the oral argument, because neither party had addressed the issue of the adequacy of the certification, the court requested additional submissions on the certification issue. Both parties submitted extensive briefings in response to the court's request. In its second supplemental brief, the defendant requested that the court dismiss the case for lack of jurisdiction, but, again, did not file a motion to this effect.

After careful consideration of the facts, the papers submitted by both parties, the record in the case, the arguments presented at oral argument, and for the reasons discussed below, the defendant's motion for summary judgment is GRANTED.

### FACTS

On or about June 15, 1983, the defendant, acting through the Navy, awarded contract No. N62474–81–C–8799 to the plaintiff, Blake, to perform construction work on the Main Hospital Complex Center at the Naval Regional Medical Center in San Diego, California. The contract was for a fixed price in the amount of $98,411,-000.00. On July 25, 1983, Blake subcontracted with Steiny to perform all electrical work on the project. The Steiny–Blake subcontract encompassed Blake's contract with the Navy and incorporated specification sections by reference, including sections 16301 and 16402.

According to plaintiff, in April 1984, a dispute arose regarding the type of conduit to be installed underground. The complaint indicates that:

> On or about April 25, 1984, and continuing thereafter to May 17, 1984, BLAKE, STEINY, and the NAVY attended meetings and/or exchanged correspondence regarding STEINY'S intention to install PVC conduit for branch circuit directly in the earth underneath slab on grade at the PROJECT.

The relevant portions of the contract are as follows:

### SECTION 16301

### UNDERGROUND ELECTRICAL WORK

### PART 1—GENERAL

\* \* \* \* \* \*

> 1.2 GENERAL REQUIREMENTS: Materials and installation shall conform to Section 16402, "Interior Wiring Systems", with the additions and modifications specified herein. The work includes furnishing of labor, material, tools, and equipment necessary for and incidental to the installation of underground electrical work in accordance with the applicable requirements of NFPA 70 and of this specification. Materials and equipment to be furnished under this contract shall be the current design products of manufacturers regularly engaged in production of such equipment and shall be listed

cause the specifications were allegedly unclear or defective. *See Blake Constr. Co. v. United States,* 25 Cl.Ct. 177, *rev'd,* 987 F.2d 743 (Fed. Cir.1993), *reh'g denied,* No. 92–5092 (Fed.Cir. 1993) (en banc) (contract dispute over underground conduits relocated to overhead locations); *Blake Constr. Co.,* 91–2 B.C.A. (CCH) ¶ 23,810 1991 WL 38293 (Armed Serv. BCA 1991); *aff'd,* 956 F.2d 1174 (Fed.Cir.1992) (contract dispute over energy monitoring and control system). By bringing at least three separate law suits regarding the same project, the same subcontractor on the same electrical installation, the plaintiff has shown a complete disregard for the resources of this court, for the resources of the Court of Appeals for the Federal Circuit, and for the public policy of judicial economy. Moreover, in the instant case, plaintiff had a continuing duty to notify the court of any related cases under the Rules of the United States Claims Court (RUSCC) and Rules of the United States Court of Federal Claims (RCFC) 77(f)(2), and failed to do so.

by Underwriters' Laboratories, Inc. (UL) or approved by Factory Mutual Systems Laboratories (F.M.)

\* \* \* \* \* \*

PART 2—PRODUCTS

2.1 MATERIALS AND EQUIP-MENT: Materials and equipment shall conform to the respective specifications and standards and to the specifications herein. Electrical ratings shall be as indicated.

2.1.1 Conduit:

2.1.1.1 Rigid Metal Conduit, P.V.C. Coated: NEMA RN 1, type A20.

2.1.1.2 Fiber Conduit: UL 543, fiber conduit Type I.

\* \* \* \* \* \*

SECTION 16402

INTERIOR WIRING SYSTEMS

\* \* \* \* \* \*

PART 2—PRODUCTS

2.1 MATERIALS AND EQUIP-MENT: Materials and equipment shall conform to the respective specifications and standards and to the specifications herein. Electrical ratings shall be as indicated.

2.1.1 Conduit:

2.1.1.1 Rigid Metal Conduit: U.L. 6, galvanized threaded.

2.1.1.2 Rigid Metal Conduit, P.V.C. Coated: NEMA RN 1, galvanized, threaded.

\* \* \* \* \* \*

The plaintiff and the defendant disagree as to how these two key sections of the contract should be read in order to determine the applicable contract requirements. Plaintiff maintains that only section 16301 applies to the installation of underground branch circuits and should be read independent of section 16402. According to plaintiff: "Thus, under the express terms of the contract, underground electrical conduit could be either rigid metal conduit, PVC coated or fiber conduit." Plaintiff further maintains that PVC conduit is recognized in the industry as an acceptable substitute for fiber conduit for underground installations. Therefore, plaintiff argues PVC conduit, not rigid metal conduit, should have been considered acceptable under the contract. The defendant, however, contends that because section 16301 references section 16402, both sections should be read together, to reach a different result. According to defendant: "Thus, under the express terms of the contract, underground electrical conduit could be either galvanized rigid metal conduit, rigid metal conduit with a PVC coating, or fiber conduit." According to defendant, the contract did not allow PVC conduit to be used.

The disagreement regarding which type of conduit should be used to install branch circuits seems to have originated with the subcontractor (Steiny) early in the contract relationship, but the record documents the first discussion of the issue at a meeting on April 25, 1984.[4] A review of the Navy's minutes of the April 25, 1984 meeting, forwarded to plaintiff Blake, however, suggests that the Navy believed that there was agreement that "Specification Section 16402 does not permit the use of PVC for the branch circuits under the Central Plant on grade," but that "[r]igid metal conduit is acceptable." Moreover, the Navy's version of the April 25, 1984 meeting that it did not direct Blake to install any particular type of conduit, but instead merely directed Blake to comply with the provisions of the contract has remained consistent.

On May 21, 1984, Steiny responded to the Navy's April 25, 1984 minutes when it wrote to plaintiff Blake:

Steiny and Company, Inc. interprets Specification 16301 as applying to the stated problem on the basis that Section

---

**4.** Part of the confusion in this case also results from the inconsistent, and interchangeable, use of terminology regarding the type of conduit required under the contract. For example, in Steiny's May 11, 1984 and May 14, 1984 letters to plaintiff, the term galvanized rigid steel conduit was used, but in the affidavit submitted by Steiny's vice president McClure, he indicated that the Navy had issued a directive that required rigid steel conduit be used. Galvanized rigid steel conduit and rigid steel conduit are not the same and as is discussed more fully below, this difference is important in the instant case.

16301 pertains to underground electrical work and the subject work is being placed underground.

Steiny questioned the "acceptability" of using rigid galvanized conduit underground and characterized the decision to use rigid galvanized conduit not as a mutual agreement, but as the Navy's determination. It is significant, however, that in the May 21, 1984 letter, Steiny did not address the issue of whether the use of PVC conduit was permitted under the contract. The record also contains an affidavit submitted by Donald McClure, a vice president of Steiny, on behalf of plaintiff stating that at the meeting on April 25, 1984, the Navy issued a directive to Blake and Steiny requiring that rigid steel conduit, not PVC conduit, be installed for the underground branch circuits.

In a May 11, 1984, letter to plaintiff Blake, the subcontractor Steiny had reported that Harco Corporation (a consultant to Steiny) had advised that extensive corrosive damage could be expected from burying rigid steel conduit underground. Moreover, Steiny interpreted the local electrical code to prohibit installation of "duct burial RSC [rigid steel conduit];"[5] Steiny indicated that it would not warrant the conduit system if rigid steel conduit was employed, and Steiny suggested that the specifications called for a defective installation. Steiny, therefore, requested that Blake obtain authorization from the government "to install PVC Schedule 40, direct burial in lieu of the requested burial of RSC [rigid steel conduit]." In the same May 11, 1984 letter, however, Steiny stated that the contract specification "requires" the use of galvanized rigid steel conduit. The letter stated: "Please reference Division 16, Section 16301, paragraph 3.1.2. This specification requires galvanized rigid steel conduit

(RSC) to be installed for underground service feeders."[6]

On May 14, 1984, Steiny had also written a letter to plaintiff Blake, however, this time taking the position that the "directive" to install galvanized rigid steel conduit amounted to a "constructive change" to its subcontract, and, according to Steiny, would result in a defective installation. Steiny wrote this letter even though Steiny had admitted only three days before, on May 11, 1984, that the contract specification "requires" the use of galvanized rigid steel conduit. In the May 14, 1984 letter, Steiny contended, despite its earlier statement, that contract drawing EO.2 (No. 6178335) permitted the installation of PVC conduit underground, and that Steiny had based its bid on this assumption. Steiny wrote:

> Our estimating procedure included an evaluation of the Contract Documents as a whole, industry practice and applicable ordinances and regulations. In this regard we found that direct burial of galvanized steel is not permitted by local electrical codes; in most circumstances direct burial of rigid steel conduit is ill advised; further, it is customary under the circumstances for branch circuit conduit to provide Schedule 40 PVC, direct burial, under slabs.

In the May 14, 1984 letter, Steiny once again requested permission to install schedule 40 PVC for branch circuits, because according to Steiny, it would be the most suitable for the intended application.

Blake relayed Steiny's concerns to the Navy by a letter dated May 17, 1984, and requested reconsideration of the Navy's position. Blake also enclosed Steiny's letters dated May 11, 1984 and May 14, 1984 and indicated that Steiny (not Blake) took exception to "your [the Navy's] determination" that galvanized rigid steel conduit

---

5. The May 14, 1984 letter from Steiny to Blake discusses "direct burial of galvanized rigid steel."

6. Plaintiff maintains that the meaning of these words have been misconstrued, and that the issue in this case pertains to the branch circuit wiring in the ground under the floor slab and not the underground conduit for service feed-

ers. The court finds this argument unpersuasive, especially in view of the fact that plaintiff admitted in its opposition brief that it had limited options, as follows: "[I]t is clear that *either* under specification § 16301 or § 16402, Plaintiff had the option of installing rigid metal conduit, PVC coated, or galvanized rigid metal conduit." (Emphasis added.)

was required by the contract. Further, Blake indicated Steiny had advised that installing galvanized rigid steel conduit below ground would result in a defective installation and that PVC schedule 40 conduit would be the appropriate material to use.

Inexplicably, the record before this court reflects a gap of almost eighteen months before the subject is raised again. On October 21, 1985, Steiny wrote to Blake stating that Steiny had been directed by the Navy to install galvanized rigid steel conduit (the date of this "direction" was not indicated), and that the subcontractor wanted this instruction in writing. Blake responded to Steiny's letter on October 31, 1985, and reported that it had sent copies of Steiny's letters of May 11, 1984 and May 14, 1984 to the Navy, but had not received any subsequent direction or instruction.

Six months later, on April 18, 1986, Steiny submitted what it titled a "change order summary" in the amount of $264,-451.83 to plaintiff Blake which calculated the "cost differential to install galvanized rigid steel conduit direct in earth, under slabs in lieu of schedule 40 P.V.C." [7] Almost nine months later, on January 15, 1987, Steiny sent Blake a letter, confirming a telephone conversation, apparently held earlier in the day, in which Steiny reiterated its desire that Blake request a change order from the government.[8]

In a letter dated January 23, 1987, Blake requested a contract modification from the Navy in the amount of $327,231.00, after adding $62,779.17 to Steiny's proposal for Blake's electrical field overhead, general and administrative costs, bond costs, and profit. Plaintiff also included the following words which it alleges constitute a valid certification:

We hereby certify that this *proposal* is made in good faith, the supporting data is accurate and complete to the best of

our knowledge and belief and that the amount requested accurately reflects the *contract adjustment* for which we believe the Government is liable. (Emphasis added).[9]

On February 12, 1987, the Navy denied Blake's request for a contract modification because it believed that installing rigid steel conduit was "in full accordance with the contract documents", and that PVC conduit was not permitted. In a letter dated February 20, 1987, Blake forwarded the Navy's February 12, 1987 denial letter to Steiny and asked Steiny whether in light of the Navy's response, "this matter may be considered closed."

Steiny, however, apparently had no intention of dropping the matter. On March 23, 1987, almost three years after the subcontractor first raised the PVC issue, Steiny responded to Blake's February 20, 1987 letter with a "demand for a Contracting Officer's Final Decision" to be transmitted by plaintiff Blake to the Navy. Additionally, Steiny offered a technical explanation of why it believed that the Navy's interpretation of the contract requirements was incorrect, and contended that the contract documents permitted "direct burial of PVC conduit below-slab-on-grade." In this letter, Steiny indicated that, at bid time, it had intended to use PVC conduit (not galvanized rigid steel conduit, rigid metal, PVC coated or fiber conduit) for underground burial, an admission that Steiny had already made a unilateral decision to deviate from the literal wording of the specifications when it bid the subcontract.

On March 27, 1987, Blake forwarded Steiny's March 23, 1987 letter to the Navy and requested a "decision of the Contracting Office," citing paragraph 6(e) of the disputes clause, and referencing its allegedly certified request for a contract modification dated January 23, 1987. The Navy,

---

7. At some point, however, Steiny did in fact go forward with the contract and installed rigid steel conduit in the ground under the slabs.

8. This letter appears in the record in two versions. One lists the amount requested as $298,-421.00. The second shows this figure to be corrected by hand, to $264,451.83.

9. As discussed more fully below, the plaintiff's use of the words "proposal," "contract adjustment" and "contract modification" raise questions for the court regarding the propriety of the certification in this case.

however, in a letter to Blake dated June 2, 1987, responded that it did not recognize plaintiff's letters of January 23, 1987 and March 27, 1987 as a valid CDA claim. The Navy indicated that it considered the January 23, 1987 letter as having been submitted under the "Changes" clause in the contract and that it considered plaintiff's March 27, 1987 letter defective as a certified claim under the CDA in that it failed to state the amount claimed or contain a proper CDA certification. Nevertheless, the Navy promised that the claim would be processed promptly "upon receipt of your quantification and certification." Blake's response to the defendant, dated June 12, 1987, emphasized that its claim in the amount of $327,231.00, dated January 23, 1987, had indeed been properly certified, and that the Navy had delayed processing Blake's request contained in its letter of March 27, 1987. Plaintiff Blake did not offer a new (or updated) certification, but instead reaffirmed "this [the January 23, 1987] quantification and certification," and requested that a contracting officer's decision be issued without delay.

On August 11, 1987, the Navy issued "FINAL DECISION # 87-48," concluding that Blake had not submitted a claim upon which a contracting officer's final decision could be issued. The contracting officer's decision stated:

> Your 27 March letter does not indicate the amount being claimed and does not contain the required certification. The certification must be given at the time of the submission of the demand for payment as a claim. In other words, the certification must attach to an existing claim to be a proper certification. Your "certification" of a change order does not satisfy the requirement of the Contracts Disputes Act and the DISPUTES CLAUSE of your contract. Accordingly, there is no "claim" upon which a Contracting Officer's Final Decision could be issued.
>
> This is the Final Decision of the Contracting Officer. This Decision may be appealed to the Armed Services Board of Contract Appeals ... In lieu of appealing to the cognizant Board of Contract Ap-

peals, you may bring action directly in the U.S. Claims Court....

On August 9, 1988, the plaintiff filed a lawsuit in this court appealing the contracting officer's Final Decision. Despite the language included in the contracting officer's final decision regarding the defective nature of plaintiff's certification, the defendant did not file a motion to dismiss for lack of jurisdiction. Instead, the defendant filed a motion for summary judgment and stated therein that the defendant does not contend that Blake's claim was improperly certified. In its motion for summary judgment, the defendant states that because the contract limits conduit to galvanized rigid metal conduit, rigid metal conduit with a PVC coating, or fiber conduit, the Navy's directive to comply with the contract terms was not a constructive change to the contract.

After review of the filing in connection with defendant's pending motion for summary judgment, following briefing by both parties, and following oral argument, the record still contained no briefing by the parties on the propriety of certification. The court, therefore, suspended the case and ordered that the parties submit additional briefs addressing the certification issue and any possible jurisdictional defect.

### DISCUSSION

#### Certification

■ Plaintiff in the instant case invokes the jurisdiction of the United States Court of Federal Claims to entertain its claims pursuant to the CDA, 41 U.S.C. §§ 601–613 (1982). As a prerequisite to litigation of government contract claims in this court, the CDA requires that a contractor's claim in an amount greater than $50,000.00 be certified when it is submitted to the contracting officer for decision. 41 U.S.C. § 605(a). The CDA specifies:

> For claims of more than $50,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately re-

flects the contract adjustment for which the contractor believes the government is liable.

41 U.S.C. § 605(c)(1).

■ As this court has previously indicated, the purpose of the CDA is to foster the prompt, efficient resolution of disputes between private contractors and the government. S.Rep. No. 1118, 95th Cong., 2d Sess. 5 (1978) *reprinted in* 1978 U.S.C.C.A.N. 5235. In addition, the certification requirement was enacted for the purpose of holding contractors personally liable for fraudulent claims. *See Skelly & Loy v. United States*, 231 Ct.Cl. 370, 376 n. 11, 685 F.2d 414, 418 n. 11 (1982); *Donald M. Drake Co. v. United States*, 12 Cl.Ct. 518, 519 (1987). The contractor's certification assures that the claim accurately reflects the estimated value of the case. *W.H. Moseley v. United States*, 230 Ct.Cl. 405, 407, 677 F.2d 850, 852 (1982), *cert. denied*, 459 U.S. 836, 103 S.Ct. 81, 74 L.Ed.2d 77 (1982).

For cases filed at the time the complaint in the instant action was filed in this court, well-settled precedent dictated that certification was a jurisdictional prerequisite in order for this court to hear a Contract Disputes Act claim. *United States v. Grumman Aerospace Corp.*, 927 F.2d 575, 579 (Fed.Cir.1991). Although this court has previously expressed its dissatisfaction with the CDA certification requirements prior to the passage of Pub.L. No. 102–572, *see Aleman Food Servs., Inc., v. United States*, 24 Cl.Ct. 345, 352 (1991), they remain applicable to the instant case. On October 29, 1992, the Court of Federal Claims Technical and Procedural Improvements Act of 1992, Pub.L. No. 102–572, § 907, was signed, pursuant to which this court may maintain jurisdiction of a lawsuit, pending correction of possible certification defects. Because this litigation was filed prior to that date, however, if plaintiff's certification is found to be defective, this case will have to be dismissed.

■ There are three questions raised regarding the propriety of the CDA claim submitted in the instant case, (1) whether the claim has been properly sponsored by the plaintiff Blake for its subcontractor, Steiny; (2) whether the contractor requested a final decision from the contracting officer; and (3) whether a dispute existed at the time the plaintiff submitted its claim. Regarding whether this claim has been properly sponsored by the plaintiff Blake for the subcontractor Steiny, it is clear that the plaintiff, Blake, is the holder of the prime contract, and is in privity with the Navy. Steiny, as Blake's subcontractor, however, is not in privity with the government, and must rely upon Blake to present its claim. "[A] determination of the proper party for certification must be preceded by a finding that the claimant is a 'contractor' under the CDA." *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1557 (Fed.Cir.1983). In the CDA, a contractor is defined as a party to a government contract other than the government. 41 U.S.C. § 601(4). Absent privity of contract, a subcontractor may not bring a CDA claim directly against the government, unless the prime contractor sponsors the claim.[10] *Johnson Controls*, 713 F.2d at 1556–57; *Century Constr. Co. v. United States*, 22 Cl.Ct. 63, 65 (1990); *Westech Corp. v. United States*, 20 Cl.Ct. 745, 749 (1990). Generally, a subcontractor may only present a claim through the prime contractor, with the prime contractor's consent and cooperation and in the prime contractor's name. *Erickson Air Crane Co. v. United States*, 731 F.2d 810, 814 (Fed. Cir.1984). "[T]he certification requirement requires not that the prime contractor believe the subcontractor's claim to be certain, but that the prime contractor believe that there is good ground for the claim." *Transamerica Ins. Corp. v. United States*, 973 F.2d 1572, 1580 (Fed.Cir.1992); *United States v. Turner Constr. Co.*, 827 F.2d 1554, 1561 (Fed.Cir.1987).

The Court of Appeals for the Federal Circuit has issued a clear statement regard-

---

**10.** The Court of Appeals for the Federal Circuit has acknowledged certain limited exceptions, including that privity can (but need not) result when a prime contractor acts as the government's agent to place subcontracts. *Johnson Controls*, 713 F.2d at 1551.

ing the rights of a subcontractor to pursue a CDA claim. According to the court:

It is a hornbook rule that, under ordinary government prime contracts, subcontractors do not have standing to sue the government under the Tucker Act, 28 U.S.C. § 1491, in the event of an alleged government breach or to enforce a claim for equitable adjustment under the Contract Disputes Act of 1978. *United States v. Johnson Controls, Inc.*, 713 F.2d 1541 (Fed.Cir.1983); *Putnam Mills Corp. v. United States*, 479 F.2d 1334, 202 Ct.Cl. 1 (1973). The government consents to be sued only by those with whom it has privity of contract, which it does not have with subcontractors. *Johnson Controls, Inc.*, 713 F.2d at 1550–52. Aggrieved subcontractors have the option of enforcing their subcontract rights against the prime contractor in appropriate proceedings, or of prosecuting a claim against the government through and in right of the prime contractor's contract, and with the prime contractor's consent and cooperation.

As a practical matter, prime contractors often do allow subcontractors to prosecute claims in the prime's name when they perceive that the subcontractors really have more at stake in a claim and are therefore willing to work harder on its enforcement. Subcontractors may also be the only ones in full possession of the facts. In the former Court of Claims, in contract cases, it was quite usual for prime contractors to step aside and allow counsel retained by subcontractors to prosecute claims, though always in the name and right of the prime.

*Erickson Air Crane Co. v. United States*, 731 F.2d 810, 813 (Fed.Cir.1984).

■ Whether a claim is properly presented under the CDA depends upon the facts of the particular case in dispute, the language of the contract and an analysis of the CDA regulations. *Dawco Constr., Inc. v. United States*, 930 F.2d 872, 877 (Fed. Cir.1991). "A claim must seek payment of a sum certain as to which a dispute exists at the time of the submission." *Id.* at 878. However, even if a certification fails to state the amount of the claim, or that it is

the contractor's belief that the government is liable, the claim can still be valid if it is in 'substantial compliance' with the CDA. *Transamerica Ins. Corp. v. United States*, 973 F.2d 1572, 1580 (Fed.Cir.1992); *United States v. General Elec. Corp.*, 727 F.2d 1567, 1569 (Fed.Cir.1984). Additionally, it is not required that a certifier have personal knowledge that data supporting a claim is accurate and complete; it is sufficient that a certifier have "indirect" knowledge. *Fischbach & Moore Int'l Corp. v. Christopher*, 987 F.2d 759, 762 (Fed.Cir.1993). The primary requisite for a certification is that it must be worded, so that the contractor assumes liability for fraud. *Transamerica Ins. Corp. v. United States*, 973 F.2d at 1581.

■ Moreover, there is "no requirement in the Disputes Act that a 'claim' must be submitted in any particular form or use any particular wording." *Contract Cleaning Maintenance, Inc. v. United States*, 811 F.2d 586, 592 (Fed.Cir.1987). Thus, more than one document, such as several letters and other documents referenced in a document, as in the case at bar, may be construed together to form a claim, and may be included in the consideration of what constitutes a claim under the statute. *United States v. General Elec. Corp.*, 727 F.2d at 1569; *Contract Cleaning Maintenance, Inc. v. United States*, 811 F.2d 586, 592 (Fed.Cir.1987); *Kvaas Constr. Co. v. United States*, 22 Cl.Ct. 740, 742 (1991); *Alliance Oil & Ref. Co. v. United States*, 13 Cl.Ct. 496, 499 (1987).

■ As previously indicated, the claim at issue is really Steiny's, and stems from Blake's subcontract with Steiny, dated July 25, 1983. The government was not a party to the subcontract and is not in privity with Steiny. Nevertheless, the government may consider Steiny's claim, provided that it is sponsored by Blake, that Blake considers there are good grounds for the claim, and that Blake intends for it (not Steiny) to be held liable for any possible fraud attributable to assertion of the claim. *Transamerica Ins. Corp., Inc. v. United States*, 973 F.2d at 1581. Otherwise stated, the

court must decide whether the plaintiff Blake has adopted this claim as its own. After careful consideration of the evidence, including the numerous documents in the record, this court concludes that plaintiff Blake has taken sufficient steps to adopt Steiny's claim.

Admittedly, there was some initial hedging on the part of the plaintiff and an apparent reluctance to vigorously pursue this claim. For example, in its March 27, 1993 letter to the Navy, plaintiff refers to the request for additional monies as "our subcontractor's claim." Nevertheless, a reading of plaintiff's letter dated June 12, 1987 clearly reveals that the plaintiff was no longer reluctant to pursue the claim. Blake not only reaffirmed its earlier "quantification and certification" of the claim, but chastised the Navy for taking so long to process the claim, calling the delay "unacceptable and unwarranted." Furthermore, in the June 12, 1987 letter, Blake stressed that its claim was "properly certified." After reviewing the record, the court finds that when plaintiff's letters dated January 23, 1987, March 27, 1987 and June 12, 1987 are read together, it is clear that Blake intended for the government to understand that plaintiff believed there were good grounds for the claim and that it intended for the claim to be treated as its own.

■ The second issue regarding the propriety of the CDA certification in this case concerns whether the plaintiff requested a final decision from the contracting officer. The third, and related issue, is whether a dispute existed at the time the plaintiff Blake submitted its "claim." No claim exists under the Contract Disputes Act without evidence that the contractor desires a final decision and that negotiations are over. *Heyl & Patterson, Inc. v. O'Keefe*, 986 F.2d 480, 485–86 (Fed.Cir. 1993). In this regard, a letter expressing an "interest" in a final decision so the contractor would be free to pursue appeal routes under the Contract Disputes Act, has been held to adequately set forth a CDA claim. *Paragon Energy Corp. v. United States*, 227 Ct.Cl. 176, 192, 645 F.2d

966, 976 (1981). The amount claimed must be in dispute, and for this reason a unilateral cost proposal or correspondence suggesting disagreement during negotiations does not constitute a CDA claim. *Dawco Constr., Inc. v. United States*, 930 F.2d 872, 878 (Fed.Cir.1991); *Mayfair Constr. Co. v. United States*, 841 F.2d 1576, 1577 (Fed.Cir.1988), *cert. denied*, 488 U.S. 980, 109 S.Ct. 528, 102 L.Ed.2d 560 (1988). For example, a contractor's letter referencing a cost proposal offered two-and-a-half months before, and adding a certification, was held not to be a claim under the Contract Disputes Act because "the parties had not reached an impasse at that time." *Santa Fe Engrs., Inc. v. Garrett*, 991 F.2d 1579, 1582 (Fed.Cir.1993). A request for payment for a sum not yet in dispute is not a CDA claim. *Id.* Once a claim is made, the contractor must commit to the contracting officer's authority to make a final decision. *Dawco Constr., Inc. v. United States*, 930 F.2d 872, 880 (Fed.Cir.1991).

In the instant case, plaintiff submitted three letters regarding its claim, dated January 23, 1987, March 27, 1987 and June 12, 1987. None of these letters, taken alone, is sufficient to satisfy the requirements of the CDA. Plaintiff's January 23, 1987 letter, on its own, is inadequate as a CDA certification. While the letter properly quantifies the claim and also includes certification language, the letter also asks for a "contract modification" or "contract adjustment," not a contracting officer's decision, and uses the term "proposal." This letter, on its own, would fail to meet the requirements of the CDA because the parties are not yet in a dispute. Likewise, plaintiff's March 23, 1987 letter by itself is not sufficient to satisfy CDA certification and quantification requirements. While this letter clearly requests a final decision from the contracting officer, and also outlines the historical development of the claim, this letter does not offer a separate certification or quantify the claim. The letter, however, specifically references the January 23, 1987 letter, which includes a certification and a request for a sum certain. Plaintiff's third letter, dated June 12, 1987, expresses some frustration in not being able to trigger a

contracting officer's decision but it does not offer a separate certification. However, this letter does reference both the January 23, 1987 and March 27, 1987 letters, thereby linking the three letters together. Moreover, the June 12, 1987 letter, once again, properly quantifies the claim at $327,231.00, the same number used in the January 27, 1987 letter, and reaffirms the previously submitted certification, while making it clear that Blake was demanding a contracting officer's decision.

When considered together, the three letters dated January 23, 1987, March 27, 1987 and June 12, 1987, including attachments supporting the claim, make it clear that as of June 12, 1987 there was a dispute between the parties, that plaintiff had requested a contracting officer's final decision for a sum certain and that plaintiff had certified the claim. In light of the doctrine of substantial compliance outlined in *Transamerica Ins. Corp. v. United States*, 973 F.2d at 1580, these three letters, each of which references the previous letters by date, when read together, satisfy the requirements for presentation of a properly certified claim under the CDA.

### Summary Judgment

Defendant has moved for summary judgment, representing that there are no genuine issues of material fact in dispute. In its opposition to defendant's motion, plaintiff maintains that defendant should not be awarded summary judgment because defendant failed to meet its evidentiary burden as the moving party. The relevant events and their chronology, however, appear not to be disputed by either party, with the exception of the parties' recollection of what transpired at a meeting on April 25, 1984.

Summary judgment in this court is properly granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of this court is patterned on Rule 56 of the Federal Rules of Civil Procedure and is similar in language and effect.[11] Both Rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c) of the Rules of this court provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of showing that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Rust Communications Group, Inc. v. United States*, 20 Cl.Ct. 392, 394 (1990); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), aff'd, 944 F.2d 885 (Fed.Cir.1991).

■ Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury [judge] could return a verdict for the non moving party." *Id.; see also Uniq Computer Corp. v. United States*, 20 Cl. Ct. 222, 228–29 (1990).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. at 2510; *see, e.g., Cloutier v. United States*, 19 Cl.Ct. 326, 328 (1990), aff'd, 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence

---

11. In general, the Rules of this court are closely patterned upon the Federal Rules of Civil Procedure. Therefore, precedent under the Federal Rules of Civil Procedure is relevant to interpreting the Rules of this court, including Rule 56.

*See Imperial Van Lines Int'l, Inc. v. United States*, 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States*, 17 Cl.Ct. 67, 70 (1989).

presents a disagreement sufficient to require submission to fact finding, and then may also determine that the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. at 1781. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. As indicated above, any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The initial burden on the party moving for summary judgment is to produce evidence showing the absence of a genuine issue of material fact. This burden may be discharged if the moving party can show, alternatively, that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); *see also Lima Surgical Assocs.*, 20 Cl.Ct. at 679. If the moving party makes either showing, the burden is placed on the nonmoving party to show that a genuine factual dispute exists by presenting evidence establishing the existence of an element of its case upon which it bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. at 2552; *Lima Surgical Assocs.*, 20 Cl.Ct. at 679. If, under no scenario, can the nonmoving party present the evidence to support its case, then there should be no genuine need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Under Rule 56, the motion for summary judgment may succeed, whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553. Generally, however, in order to prevail, the nonmoving party will need to go beyond the pleadings, by use of evidence such as affidavits, depositions, answers to interrogatories and admissions, in order to show that a genuine issue for trial exists. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553.

In its opposition to defendant's motion for summary judgment, the plaintiff does not allege a classic dispute as to the existence of material facts in dispute, but rather asserts that as a procedural matter, the defendant has not met its evidentiary burden on summary judgment because the defendant's motion is not properly supported. The plaintiff relies on RUSCC and RCFC 56 and Appendix H, thereto, which establish evidentiary standards for presenting factual proof on summary judgment. Plaintiff argues that defendant's motion should fail because it is unsupported by any of the elements included in Appendix H, such as affidavits, declarations, depositions, transcripts, pleadings, answers to interrogatories, admissions on file, or any other evidence which would be admissible at trial to support the factual allegations and conclusions made by the defendant. Plaintiff, therefore, asserts that defendant relies on unsupported factual allegations. In its filings, plaintiff confuses unsupported facts, conclusory argument submitted by counsel and material facts in dispute. For example, the plaintiff urges the court to base its decision rejecting defendant's motion for summary judgment on the following, and states:

1. At the time the dispute arose, Steiny acknowledged that § 16301 was applicable to installation of the underground branch circuits and that § 16301 'requires galvanized rigid steel conduit ("RSC") to be installed for underground feeders.

Defendant has offered no admissible evidence to support its discussion of

"feeders". Indeed, feeders are not even related to the subject at bar. This dispute involves circuit branch conduit, not feeders.

2. Defendant's motion referencing fiber conduit is devoid of any admissible evidence explaining what fiber conduit actually is. As is evidenced by Plaintiff's opposition, fiber conduit is now considered to be PVC.

3. Defendant has offered no admissible evidence, and in fact no evidence at all, in support of its contention that § 16402 is applicable to the case at bar.

The issues plaintiff raises, however, largely raise questions of contract interpretation and, thus, are questions of law to be decided by the court, and, therefore, will not preclude summary judgment.

In its motion for summary judgment, the defendant relies on its pleadings, its brief and the appendix accompanying its motion in support of its position. Contained in the appendix, are portions of the contract, correspondence between the parties, and correspondence between the plaintiff and its subcontractor. The authenticity of the documents relied on by defendant does not appear to be challenged by the plaintiff. In fact, in the appendix to its supplemental brief addressing the propriety of the certification, plaintiff has submitted copies of the same key documents as those offered by the defendant. This court is not persuaded that plaintiff's threshold objection regarding defendant's failure to support the evidence on which it relies is valid, particularly in view of the fact that both plaintiff and defendant essentially rely on the same documents in the record for support. In fact, there appear to be no material facts in dispute in the case at bar.

Even at oral argument the plaintiff remained somewhat unclear as to which issues of material fact it considered to be in dispute. Moreover, the issues, presented by the plaintiff at oral argument, were stated somewhat differently than in plaintiff's filing, and included the following:

1) Whether the plaintiff was entitled to use PVC in fulfillment of the contract, and whether industry and trade practice and the alleged unavailability of fiber conduit supported the subcontractor's use of PVC under the contract specifications;

2) The extent to which the National Electric Code applies (whether the National Electric Code, incorporated in the contract, or the local electric code prohibits the direct burial of galvanized rigid metal conduit);

3) Whether this contract involves branch circuits or service feeder systems.

Once again, all three issues involve interpretations of contract language and thus are questions of law which can be resolved by the court on summary judgment. The only possible question of fact raised concerns industry and trade practice. However, as is discussed below, the court does not reach the industry and trade practice issue because the contract language in question is not ambiguous. In essence, the main issue in the instant case, although not clearly articulated by the plaintiff, is whether the contract at issue allowed PVC conduit to be installed underground.

 The interpretation of a government contract is a matter of law. *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir.1985); *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 386, 351 F.2d 972, 973 (1965). As stated by the Court of Appeals for the Federal Circuit, "[q]uestions of contract interpretation are issues of law and can be disposed of at summary judgment." *Government Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 812 & n. 1 (Fed.Cir.1988); *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984). The language of the contract must be given the meaning that would be derived from the contract by a "reasonably intelligent person acquainted with the contemporaneous circumstances." *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. at 388, 351 F.2d at 975. Only when the language of a contract is ambiguous will factors outside of the contract terms be taken into account. *See Sylvania Elec. Prods., Inc. v. United States*, 198 Ct.Cl. 106, 126, 458 F.2d 994, 1005 (1972). "[W]hen the terms of a con-

tract are clear and unambiguous, there is no need to resort to extraneous circumstances, such as prior negotiations or custom of the trade for its interpretation." *Peterson–Sharpe Eng'g Corp. v. United States,* 6 Cl.Ct. 288, 295 (1984) (citing *David Nassif Assocs. v. United States,* 214 Ct.Cl. 407, 419–20, 557 F.2d 249, 256 (1977)); *Sea–Land Serv., Inc. v. United States,* 213 Ct.Cl. 555, 567, 553 F.2d 651, 658 (1977), *cert. denied,* 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978); *Sylvania Elec. Prods., Inc.,* 198 Ct.Cl. at 126, 458 F.2d at 1005; *Northwestern Indus. Piping, Inc. v. United States,* 199 Ct.Cl. 540, 550–51, 467 F.2d 1308, 1314 (1972); *Perry & Wallis, Inc. v. United States,* 192 Ct.Cl. 310, 315, 427 F.2d 722, 725 (1970) (citing *Duhame v. United States,* 127 Ct.Cl. 679, 683, 119 F.Supp. 192, 195 (1954)).

■ The parties disagree as to what types of conduit are permitted by the contract specifications. Plaintiff argues that only section 16301 applies to this litigation, because it is titled "Underground Electrical Work." Under section 16301, two types of conduit are permitted, PVC coated rigid metal conduit and fiber conduit. However, plaintiff contends that fiber conduit is no longer available, and therefore, plaintiff relies on paragraph 1.2 of section 16301 to permit substitution of PVC for fiber conduit. Section 16301 reads:

> GENERAL REQUIREMENTS: *Materials and installation shall conform to Section 16402, "Interior Wiring Systems",* with the additions and modifications specified herein. The work includes furnishing of labor, material, tools, and equipment necessary for and incidental to the installation of underground electrical work in accordance with the applicable requirements of NFPA 70 and of this specification. Materials and equipment to be furnished under this contract shall be the *current design products* of manufacturers regularly engaged in production of such equipment and shall be listed by the Underwriter's Laboratories, Inc. (UL) or approved by Factory Mutual Systems Laboratories (F.M.) (Emphasis added.)

Plaintiff reasons that because it had determined that fiber conduit was no longer available in the sizes required for the installation, but only in sizes larger than those specified for installation under the contract, and that "PVC was the 'current design product' of choice to replace the fiber conduit called for in [the] contract specification ..." that it "had the option of either utilizing rigid metal conduit, PVC coated, or PVC" during contract performance. In its opposition to summary judgment, the plaintiff submitted the affidavit of its purported expert, Harry Allan MacDonald, an electrical engineer, in support of its theory that PVC conduit is allowed by the contract as a current industry substitute for fiber conduit. Mr. MacDonald's affidavit states in relevant part:

> Pursuant to my duties as a registered engineer and as a result of my twenty years of experience as aforementioned, I possess personal knowledge of the current design products of manufacturers regularly engaged in the production of conduit. PVC conduit is the 'current design product' replacing fiber conduit and as such was the correct conduit to be installed.

Mr. McDonald's affidavit, however, cannot take precedence over the plain meaning of those contract terms. The language "current design product" must be read together with the contract specifications. When read in the context of the whole contract it is clear that the words "current design product" mean the current product line of the materials specified in the contract. "Current design product" does not mean that the plaintiff can unilaterally substitute a new material not even listed in the contract specifications.

The defendant notes that the GENERAL REQUIREMENTS paragraph in section 16301 references and incorporates section 16402, "Interior Wiring Systems." Section 16402 also permits galvanized rigid metal conduit. Defendant reasons that when sections 16301 and 16402 are read together, the plaintiff had three choices of conduit: "galvanized rigid metal conduit, rigid metal conduit with a PVC coating, or fiber conduit." The defendant concludes: "The con-

tract did not allow PVC conduit to be used for underground electrical branch circuits."

■ The law is clear that when interpreting the language of a contract, a court must give reasonable meaning to all parts of the contract and not render portions of the contract meaningless. *Fortec Constructors*, 760 F.2d at 1292; *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed.Cir.1983). When all parts of the instant contract are read together, so that all the parts of the contract harmonize, it is clear that section 16301 intended by its terms that "materials and installation also shall conform to Section 16402," thereby linking the two sections together. The plain meaning of the language of the two relevant contract sections, sections 16301 and 16402, is clear.[12] Under the two sections of the contract, permissible electrical conduit is defined as: rigid metal conduit with a PVC coating (16301.2.1.1.1), fiber conduit (16301.2.1.1.2), galvanized and threaded rigid metal conduit (16402.2.1.1.1), or galvanized and threaded rigid metal conduit with PVC coating (16402.2.1.1.2).

■ Moreover, as in the instant case, when the terms of a contract are unambiguous evidence of trade practice or industry custom is irrelevant. *R.B. Wright Constr. Co. v. United States*, 919 F.2d 1569, 1572 (Fed.Cir.1990) ("Neither a contractor's belief nor contrary customary practice ... can make an unambiguous contract provision ambiguous, or justify a departure from its terms."); *S.S. Silberblatt, Inc. v. United States*, 193 Ct.Cl. 269, 288, 433 F.2d 1314, 1323 (1970). Therefore, given a contract which is clear on its face, and which specifically permits galvanized rigid metal conduit, the plaintiff's argument that expert testimony is necessary to determine whether PVC conduit had been properly substituted for fiber conduit is not persuasive.

It is interesting to note that in Steiny's letter to plaintiff dated May 11, 1984, the subcontractor seemed to admit that con-

tract specifications called for galvanized rigid steel conduit, not PVC. Steiny wrote:

> Please reference Division 16, Section 16301, paragraph 3.1.2. This specification requires galvanzied [sic] rigid steel conduit (RSC) to be installed for underground service *feeders*. [Emphasis added.]

Yet, in its brief in opposition to defendant's motion for summary judgment, plaintiff attempted to counter the impression left by the May 11, 1984 letter, maintaining that feeders were not at issue in the instant case, only branch circuits. According to plaintiff:

> Defendant has offered no admissible evidence to support its discussion of 'feeders.' Indeed, feeders are not even related to the subject at bar. This dispute involves circuit branch conduit, not feeders.

Moreover, the plaintiff's point that feeders are not related to the subject at bar is contradicted by none other than Steiny in its letter to plaintiff, dated October 21, 1985. In the later letter, Steiny specifically references its own May 11, 1984 letter regarding *feeders* and states:

> On May 11, 1984 letter no. 9031–1003 and May 14, 1984 letter no. 9031–1001 we requested that the Navy allow us to install PVC Sch. 40 conduit for *branch circuits* under the slab in lieu of direct burial galv. [sic] rigid steel. [Emphasis added.]

In other words, Steiny's October 21, 1985 letter suggests that even the subcontractor was utilizing branch circuits (the term used in the letter dated October 21, 1985) and feeders (the term used in the May 11, 1984 letter) somewhat interchangeably. For this reason, the court remains unconvinced that Steiny was unaware that PVC conduit was not approved for use under the contract. Accordingly, the court concludes that the contract provided three options regarding the installation of conduit: galvanized rigid metal conduit, PVC coated

---

12. The court is struck by the plaintiff's willingness to embrace one sentence in the GENERAL REQUIREMENTS of the contract, the one dealing with "current design products," and disregard another sentence, the one referencing section 16402, even though when the specifications are read as a whole it is clear that sections 16301 and 16402 are linked.

rigid metal conduit or fiber conduit. Plaintiff's argument that PVC conduit was permitted under the contract is rejected by the court.

Notwithstanding the plain or ordinary meaning of the applicable contract language at issue in this case, the plaintiff contends that the contract does not permit the use of galvanized rigid metal conduit because this would conflict with the National Electrical Code. As urged by the plaintiff, the contract does require that the installation by the contractor comply with the National Electric Code (NEC). The National Electric Code for 1978, submitted to the court by the plaintiff, provides in pertinent part:

ARTICLE 346—RIGID METAL CONDUIT

346-1. Use. The use of rigid metal conduit shall be permitted under all atmospheric conditions and occupancies subject to the following:

\* \* \* \* \* \*

(c) Ferrous or nonferrous metal conduit ... shall be permitted to be installed in concrete, in direct contact with the earth, or in areas subject to severe corrosive influences where protected by corrosion protection and judged suitable for the condition.

\* \* \* \* \* \*

The plaintiff, however, notwithstanding the contract provisions, interprets the NEC as prohibiting the use of galvanized rigid metal conduit in underground installations subject to severe corrosive influences. The plaintiff's conclusions were based mainly on a soil sample test prepared by Steiny's consultant, Harco Corporation, which indicated that the soil surrounding the installation is subject to severe corrosive influ-

ences and recommended that galvanized rigid metal conduit not be used, and on plaintiff's reading of the applicable NEC guidelines. The plaintiff appears to argue that this evidence of industry practice, coupled with the language of the NEC Art. 300–6(b) (1981 edition) requiring the use of "material judged suitable for the condition," creates an issue of material fact notwithstanding the plain meaning of the contract.

The plain meaning of the NEC regarding direct burial of rigid metal conduit in corrosive soil, however, contrary to plaintiff's assertions, appears to allow the conduit to be installed in direct contact with the earth, provided approved corrosion protection is utilized, such as zinc coating protection. A standard dictionary definition of "galvanize" is "to coat (metal esp. [sic] iron or steel) with zinc,"[13] Thus, the NEC would appear to allow galvanized rigid metal conduit to be used in the underground installations in question, pursuant to the contract, since no particular corrosion protection is identified as required by the contract and galvanization is a corrosion preventative.[14]

Furthermore, the government has the right to insist on compliance with the contract specifications. The government is entitled to assess its true needs. *See Data Gen. Corp. v. United States*, 915 F.2d 1544, 1552 (Fed.Cir.1990). Additionally, "the Government is entitled to obtain precisely what it contracts for as long as it does not mislead the contractor." *American Elec. Contr. Corp. v. United States*, 217 Ct.Cl. 338, 350, 579 F.2d 602, 608 (1978). In fact, the government may require material specifications more or less stringent than the standards normally accepted in a trade or industry at the time. *See Ralph Larsen & Son, Inc. v. United*

---

13. *See* The Random House College Dictionary, revised edition (Random House, Inc. 1980). In addition, the plaintiff refers to the affidavit of one of its expert witnesses who cites a design manual published by the American Iron and Steel Institute as further evidence of the industry standard. However, this manual states: "Section 346–1, NEC, permits rigid steel conduit to be used in any type of atmosphere and in any type of occupancy when protected by a suitable coating, such as galvanizing."

14. Despite the foregoing discussion of the NEC, the issue is now moot. As previously stated, plaintiff did install rigid metal conduit at the contract site and the only question remaining is whether this constituted a constructive change to the contract between plaintiff and defendant, and whether the plaintiff improperly was denied the option of installing PVC.

*States,* 17 Cl.Ct. 39, 46 (1989). The government could, if it wanted "engage a contractor to make snowmen in August." *Rixon Elecs., Inc. v. United States,* 210 Ct.Cl. 309, 320, 536 F.2d 1345, 1351 (1976). Accordingly, the government is within its rights to reject substitute materials. *Henry Spen & Co. v. United States,* 139 Ct.Cl. 613, 616, 153 F.Supp. 407, 409 (1957). Therefore, the plaintiff did not have the option to unilaterally substitute PVC for fiber conduit. Moreover, without some price consideration, the government should not allow a bidder to substitute less expensive materials and argue that they conform to the technical requirements of the contract. *Farwell Co. v. United States,* 137 Ct.Cl. 832, 837, 148 F.Supp. 947, 950 (1957). Even industry trade practices will not take precedence over a clear contract requirement. *S.S. Silberblatt, Inc. v. United States,* 193 Ct.Cl. 269, 288, 433 F.2d 1314, 1318 (1970), *WRB Corp. v. United States,* 183 Ct.Cl. 409, 436, 1968 WL 9146 (1968).

In the instant case, Steiny's choice of PVC conduit was never included as an option in the contract specifications. At no time did the Navy indicate that it approved of the plaintiff's choice to install PVC. Moreover, the plaintiff was never correct in its assumption that the government, or the terms of the contract, allowed the use of PVC conduit in the installation. The plaintiff was not entitled to read the PVC conduit option into the contract although, under the contract, plaintiff could have installed PVC coated metal conduit or could have installed galvanized rigid metal conduit.

As this court has previously stated, to recover on the basis of a constructive change, the contractor must show that the government required the contractor to perform work which was not a necessary part of the contract. *J.F. Allen Co. & Wiley W. Jackson Co. v. United States,* 25 Cl.Ct. 312, 320 (1992); John Cibinic, Jr. & Ralph C. Nash, Jr., *Administration of Government Contracts,* 325 (2d ed. 1986).

The plaintiff's claim is based solely on the misinterpretation of the contract specifications by its subcontractor, Steiny, which was endorsed by plaintiff in the claim it submitted to the government. Steiny's decision to prepare its bid based on the use of PVC conduit for underground installation was caused by its own deliberate, or inadequate, misunderstanding of the contract specifications, and does not allow the plaintiff to claim that a constructive change to the contract was directed by the government. Subcontractor Steiny entered into an agreement with Blake which incorporated the specifications in Blake's government contract, and which, pursuant to sections 16301 and 16402, called for galvanized rigid metal conduit, rigid metal conduit with a PVC coating or fiber conduit. Moreover, Steiny admitted that at the time it bid on the subcontract, it unilaterally planned to install PVC conduit in response to the above requirement. Only after much discussion did the subcontractor finally install galvanized rigid metal conduit.

A subcontractor does not have the right to unilaterally substitute material of its choice for those called for by the terms of the government contract. The government was within its rights to insist upon compliance with the unambiguous specifications in the contract, and to refuse to permit any substitutions. Accordingly, plaintiff's claim for additional monies for installing galvanized rigid steel conduit, in accordance with the contract specifications, is not warranted. Therefore, the court finds the defendant is entitled to judgment. The defendant's motion for summary judgment is, hereby, GRANTED.

**IT IS SO ORDERED.**